## PARK *v.* THE STATE.

COBB, J. The evidence was altogether circumstantial, and, not being of such a character as to show the guilt of the accused beyond all reasonable doubt, a new trial should have been granted.

*Judgment reversed. All the Justices concur, except Simmons, C. J., and Candler, J., absent.*

Argued May 16,—Decided June 13, 1905.

Indictment for murder. Before Judge Lewis. Greene superior court. April 8, 1905.

The plaintiff in error was convicted under an indictment charging him with the murder of his wife. The evidence tended to show that she was killed by shots fired from a gun, or gun and pistol, while she was standing at a well near the house in which she and the accused lived. She was killed in the afternoon of Friday, and the last time they were seen before the killing was about noon on that day, at Webb's house, about a mile or three quarters of a mile from the scene of the homicide. Webb's house was on H. G. Moore's place, where the accused was employed as a laborer, and the deceased brought his dinner there that day, as she had been in the habit of doing, and left, saying that she was going back home to do some washing. The accused ate his dinner and left, going towards Moore's house, which was in a different direction from that in which his wife had gone. Webb testified that while the accused and the deceased were there on that occasion, the accused asked him if he had "known people to kill people and get off." Nothing had been said before, as to killing anybody. The accused told Webb that he and his wife were "mad," and had not spoken since Thursday morning. Webb's wife testified that later they met the accused coming towards

them, and that he fell down and said that somebody had killed his wife, and grunted. They went to where she was killed, and found her lying there. There was testimony by two witnesses as to tracks at the place of the homicide, which were found the next morning, and which corresponded with the shoes then worn by the accused. One of these witnesses (H. G. Moore) testified: "I made investigation, next morning, as to signs indicating the place where the person was who did the shooting. . . I saw where he was lying or kneeling down when the shot was fired. It was seven steps from where the woman fell, behind a garden fence and a fig tree. I could see where the grass had been bent down, and it looked like he had been kneeling. I went to where he got over the fence and went on down, and as soon as I got to where I could see his track plain I noticed it. He was sort of pigeon-toed, and as soon as I saw the track I told some one to bring him there, and I put his foot in the track. Mr. Ingram had his left foot and I had his right foot. His right shoe was bursted, and when he bore down on it that bore the counter down on the ground, and it made a print; the counter of his shoe went down into the ground. I did not notice the other foot, but I know he walks pigeon-toed. The track and his shoe fitted exactly. . . I saw 15 or 20 tracks; we took the measure of 5 or 6. The tracks were of a pigeon-toed character. . . There was only evidence of one track from what I saw. . . The ground was dry. . . I did not see any tracks in the garden. The garden was grown up in grass. . . The tracks were leading towards my house. . . Going through the place where the killing was is the nearest way to the ferry, nearer than round by the public road, and there are a good many negroes on this place. . . There were probably 50 or 75 darkies over there during that day." Ingram testified: "I was on the coroner's jury; it was held about 10 o'clock in the morning, the next day after the killing. . . I saw where there were tracks in the garden, the way he came and the way he ran back, and the way the woman at the well stood, and the way the party that did the shooting ran. He came up back of the garden and of some figs. . . You could see that the party was standing that did the shooting, and he jumped over the fence. . . There was but one track, and it went in different directions. There was a lot of woods there. He came up from the lower edge of it, and turned and

went to the right, and got to the lower edge of the garden.    He came one way and went another. . . .    I went and got the defendant and carried him down where the tracks were. . .  He had a shoe that was peculiar, that had a sort of plug out of it, about the size of a silver half-dollar.    It was the plug that looked like it had been cut out.    He had on that shoe when I found him.    I measured five or six tracks, and the shoes he had on corresponded with these tracks exactly; the little piece in the shoe fitted in the tracks.    The little plug being cut out was a very unusual condition for the shoe to be in.    I don't reckon there is another shoe like it in a thousand. . . .    I think the patch was on the left shoe. . .    I looked for the tracks after I was sworn on the coroner's jury.    I did not pay much attention to them in the garden.    I reckon we tracked them 200 yards toward the river. . . You could not see the tracks plain in the garden. . .  There were a good many negroes out there that day.    I only noticed that one track. . .    I could not tell whether the tracks in the garden were the same as went down that pasture.    We fitted the shoe to the tracks on a galled place about one hundred yards from the garden; you could see a plain track there.    I did not examine to see if there were any tracks any nearer the well than the garden. . .    I think these tracks were leading in the direction of Holcomb Moore's house. . .    We followed the tracks until we could not find them any more.    We measured four or five, and they fit exactly."    Moore testified, that some weeks after the homicide he found a gun and pistol about a hundred yards from where the accused had been at work on the day of the killing; the gun was hid in a gully, in broom-sedge, and the pistol was near it.    The gun had an empty shell in it.    Ingram testified, that when the gun was afterwards shown to the accused, he said it belonged to his brother, and that the pistol belonged to Henry Lee; "he said he had owned the gun or pistol, one."    Henry Lee testified, that the pistol belonged to him and the gun to a brother of the accused; that they were kept in the house of the mother of the accused, near where the accused lived; that the pistol was kept in a trunk, which was unlocked; that he missed it on Friday night, and that the last time he had seen it before that night was on Wednesday night, when he greased it and put on the trunk, with a rag over it.    There was testimony as to a razor

cut on the leg of the deceased, made by the accused a short time before the homicide, and that he said it was made accidentally. There was further testimony as to bad feeling between them. A witness testified that on the day preceding the day of the homicide the deceased said she was afraid that John Henry Jackson was going to kill her; that she was afraid of him because he and her husband "had been in some words." The accused made a statement to the jury, in which he said that at the time of the killing he was at work in a field near Mr. Moore's house, about a mile from the place of homicide; and that there had been bad feeling toward him on the part of John Henry Jackson; that his wife had told John Henry to quit coming to the house to see her sister; and that about two weeks before the killing he was told that John Henry had threatened to kill him.

*James B. & Noel P. Park,* for plaintiff in error, cited *Ga. R.* 110/293; 97/212 (3); 50/513; 53/252; 57/482; 110/310; 113/721; 114/10; 121/334.

*John C. Hart, attorney-general,* and *Joseph E. Pottle, solicitor-general,* cited *Ga. R.* 59/738; 63/90; 92/14.